271 F.2d 930
 DENISE COAL COMPANY, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
ESTATE of Charles J. MARGIOTTI, Deceased.
Denise Z. MARGIOTTI, Executrix, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Juliette C. SUTO (Formerly Juliette C. Margiotti), Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 12726-12728.
 United States Court of Appeals Third Circuit.
 Argued October 19, 1959.
 Decided November 18, 1959.
 
 COPYRIGHT MATERIAL OMITTED Samuel L. Goldstein, Alexander L. Suto, Pittsburgh, Pa. (Suto, Power, Goldstein & Walsh, Pittsburgh, Pa., on the brief), for petitioners.
 Marvin W. Weinstein, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Kenneth E. Levin, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.
 Before GOODRICH and KALODNER, Circuit Judges, and WOOD, District Judge.
 GOODRICH, Circuit Judge.
 
 
 1
 These three appeals raise tax questions coming from the process of strip coal mining in western Pennsylvania. We have taken three appeals together. They involve a number of contracts between Denise Coal Company and persons with whom it made contracts for strip mining on lands which it either owned in fee or in which it purchased or leased mineral rights. The coal strip contracts differ slightly in individual particulars but we think that there is no substantial difference among them and that we may treat the problems in one as common to all. The opinion of the Tax Court gives a detailed statement of the entire situation. 1957, 29 T.C. 528. Petitioners are the Denise Corporation and the equal partners in the now defunct Denise partnership.
 
 
 2
 There are three questions involved in each of the appeals. One has to do with depletion, another with a reserve for rehabilitation and a third with loss of value in lands which have been subjected to the strip mining process.
 
 
 3
 1. Depletion Allowance.
 
 
 4
 The first point presented by the taxpayers, and on which the Tax Court denied them their claim, has to do with the depletion allowance in coal mining operations.[1] The statute provided for a five per cent annual depletion deduction in coal mining cases.[2] The theory of the depletion allowance has been stated many times by many courts and is summed up by Mr. Justice Whittaker in Parsons v. Smith, 1959, 359 U.S. 215, 220, 79 S.Ct. 656, 660, 3 L.Ed.2d 747, quoting from former opinions. The depletion deduction "`is permitted in recognition of the fact that the mineral deposits are wasting assets and is intended as compensation to the owner for the part used up in production.' * * * In short, the purpose of the depletion deduction is to permit the owner of a capital interest in mineral in place to make a tax-free recovery of that depleting capital asset." Often it is the stripper who claims the depletion deduction or part of it. This Court had that situation in Parsons v. Smith, 3 Cir., 1958, 255 F.2d 595, affirmed 1959, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747, and Huss v. Smith, 3 Cir., 1958, 255 F.2d 599, affirmed, 1959, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747. In the instant case the coal owner, by which we mean Denise who had the legal right to have the coal strip mined, is claiming the depletion allowance. The record does not show that the strippers have made any such claim. Both stripper and owner may not have this depletion allowance. The Commissioner seems to take the position of opposing either party who demands it. This was the case in Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U. S. 308, 76 S.Ct. 395, 100 L.Ed. 347, in which the Commissioner had opposed both parties and lost to both in the lower courts but succeeded in getting the Supreme Court to allow it to only one.
 
 
 5
 The test of the validity of the strippers' claim to the allowance as worked out in the statute, regulations[3] and decisions is that the stripper, in order successfully to claim it, must have an "economic interest" as distinguished from merely an "economic advantage" from the contract. This is all worked out and well expressed in the opinions in the Parsons case both in this Court and on appeal. The instant case is one which bears many resemblances to Parsons and is quite different from the fact situation shown in Commissioner of Internal Revenue v. Mammoth Coal Co., 3 Cir., 1955, 229 F.2d 535, certiorari denied 1956, 352 U.S. 824, 77 S.Ct. 31, 1 L.Ed.2d 47.
 
 
 6
 There are six stripping contracts involved in the proceedings before us: one with B. Perini and Sons, Inc. (Perini), one with Sanders and Bills (Sanders), two with Bozeman & Gray (Bozeman No. 1 and Bozeman No. 2) and two with Juliette Coal Company (Juliette No. 1 and Juliette No. 2). For the most part there are only minor differences in wording among these contracts. We set forth the Perini contract in an appendix to this opinion and indicate, where we deem it important, the places where the other contracts vary.
 
 
 7
 Like Parsons, and unlike Mammoth, the strippers in the instant case did not have an exclusive right to mine the coal involved; although only four of the contracts have an express provision to that effect, such a provision seems to be clearly implied in the other two and the government conceded as much in oral argument and in its brief. Nor did the strippers here agree to mine to exhaustion.
 
 
 8
 Here also, the strippers are paid at a definite contract price per ton. True, if prices, then subject to OPA regulation, go up the stripper gets more, but if prices go down the stripper does not necessarily get less; the price in the latter instance is subject to readjustment by the parties.
 
 
 9
 It is clear that payment is to be made by Denise for all coal leaving the pit (see section 2 of the Perini contract in appendix). The payment remittance provisions are not to the contrary, as the government would have us believe. Although payment remittances in three of these contracts are geared to "coal mined and sold," this in no way indicates that Denise will not pay the strippers for coal mined, removed and loaded but which cannot be sold for one reason or another; in fact, the last sentence of the first paragraph of the Perini contract gives just the opposite impression. Although the other three contracts permit the strippers to sell, in their own names, any coal which they produce, but which Denise fails to sell, even then the stripper can only retain an amount equal to the contract price (plus a sales commission) and must remit the excess to Denise. And even in these latter three contracts, it is only an "option" which the stripper has to sell the coal; if it so desires, it can decide to sit back (and not earn the sales commission) and will still be entitled to payment. Thus, it is seen that the strippers, under all the contracts, were looking to Denise alone for payment, that their right to payment did not depend upon Denise's ability to sell the coal[4] and that the strippers had no right to sell the coal to others, except in the limited situation noted above, and had no right to participate in the profits from any sales.
 
 
 10
 Although, unlike Parsons, the contracts here were not terminable at will without cause, they were subject to termination by Denise on short notice upon the happening of certain events. All of the contracts were on a year to year basis and could be terminated upon 60 days notice prior to April 1. The fact that Denise could not cancel during the year if the stripper produced a minimum amount of coal and if Denise could sell at a 10% profit is not, in our opinion, sufficient basis to say that the stripper had an "economic interest" in the coal.
 
 
 11
 The investments of the strippers were in access roads, in equipment for their own businesses and in portable equipment shops and field offices for their own personnel. The machinery and equipment were not wasting assets but ordinary depreciable property. All machinery and equipment were readily removable and there is nothing in the record to indicate that they were not usable on other jobs. On the other hand, Denise itself furnished the loading docks, conveyors, sidings and tipples.
 
 
 12
 Finally, it should be noted that Denise paid all real estate taxes on the properties involved, put up all bonds for rehabilitation of the properties stripped and paid the insurance on all of its structures.
 
 
 13
 The Tax Court decision was made prior to the affirmance of our Parsons decision by the Supreme Court. We conclude in this case that while the strippers no doubt had an "economic advantage" (either realized or hoped for) in the performance of these contracts there was no "economic interest" in them as the cases require in order that they may have the depletion allowance. The decision of the Tax Court on this point will be reversed.
 
 
 14
 2. Rehabilitation Problem.
 
 
 15
 Strip mining is no doubt an effective and money-saving way to remove coal from land in large quantities. But its effect on the appearance of the landscape after the operation is completed is worse, perhaps, than war. The land is laid waste. To meet this problem some of the coal mining states have passed statutes requiring strip mine operators to rehabilitate the land devastated by the mining operations.
 
 
 16
 Pennsylvania passed such a statute in 1945. The statute requires that the overburden must be replaced within one year after the completion of the strip mining operation and that trees, shrubs or grasses must be planted on the lands in an effort to restore the landscape to what it was before the mining took place. Before commencing any strip mining, the operator must file performance bonds.[5]
 
 
 17
 In this case Denise was on the accrual system of accounting. It set up on its books for each year an allowance for the estimated cost of rehabilitating the property mined during the year to meet the requirements of the Pennsylvania statute. The Commissioner refuses to allow this as an item of expense "paid or incurred during the taxable year," Int. Rev.Code of 1939, § 23(a) (1) (A), and the Tax Court has upheld him. The argument is that Denise did not accurately estimate what the rehabilitation process would cost. Furthermore, says the Commissioner, while you posted the bond as required by the Pennsylvania law, it appears that the Pennsylvania authorities were not exacting in making you conform to it. You had more time than the statute allows and some of your replacements are not yet completed. Perhaps you may not even complete them; maybe you will forfeit the bonds instead.
 
 
 18
 This last point we think little of. The Pennsylvania statute imposes a fixed and definite obligation. We cannot suspect these taxpayers of an intention not to fulfill it. The matter of timing was evidently not considered by Pennsylvania authorities to be of the essence. Indeed, on some of the property, it is shown, deep mining was still going on when the stripping operations had been completed. Just how far this extends and what the arrangements were with the Pennsylvania authorities is not in the record. All we know is from the finding of fact that:
 
 
 19
 "On some of the tracts that Denise had strip mined, other parties were deep mining. Under agreement with those doing the deep mining, Denise did not backfill these properties. Some properties which had been stripped in 1944 were stripped deeper in the subsequent years involved. During the years involved Denise did not have sufficient equipment available to do the backfilling. The State authorities and Denise have worked together regarding the backfilling problem, and strict compliance with the provisions regarding time for backfilling has not been required. During the periods involved the restoration requirement was never immediate. Denise did not forfeit any bonds by its failure to restore any property during the years involved." 29 T.C. at pages 538-539.
 
 
 20
 Denise did not make a blind guess in the amount of reserve set up. Its own employees, including its engineers, who were by way of being fairly expert themselves, and the employees of some of the stripping contractors participated in making the estimate. In addition, outside contractors were consulted to secure their estimates as to the cost of backfilling, and all estimates were verified by Denise's accountants.
 
 
 21
 The Tax Court stated the factors which Denise considered:
 
 
 22
 "In arriving at the estimated cost Denise considered the amount and type or character of overburden (average in feet) that would have to be replaced in the pits; the height or thickness of the coal seam (inches); the width of the different pits involved; the character of water and drainage problems; the type of equipment that had been used in the stripping operations; the distance between the pits to be backfilled and the points where the spoil banks had been piled; the various angles (varying from 90 degrees to 45 degrees) at which the strippers had cut; and, particularly, the physical composition of the overburden, whether composed of big boulders, shale, or dirt. Denise also considered the bids submitted by contractors.
 
 
 23
 "Denise estimated that it would recover 4,000 tons of coal per acre. It also estimated for the years 1945 and 1946 that backfilling would cost $300 per acre. It converted the per-acre cost into a per-ton cost of 7½ cents ($300 per acre ÷ 4,000 tons per acre). For 1947, it used per-ton cost greatly in excess of the previous per-ton cost. One of the reasons for the 1947 rate increase was the fact that greater amounts of overburden were uncovered in some areas. In 1948, a per-ton cost of 15 cents was used. Also in 1948, the 1946 (June 1 to December 31, 1946) cost of 7½ cents was revised upward to about 15 cents and the 1947 cost was revised downward to 15 cents." 29 T.C. at page 539.
 
 
 24
 We do not think that we should expect from taxpayers in this case, or any other, the ability to estimate cost of this kind with mathematical precision. At best it must be an estimate and if made reasonably should be allowed even though the estimate proves too small or too large. The taxpayer on an accrual system of accounting will not have his books "clearly reflect" the state of his income if he does not make such a reserve, and the statute requires that a taxpayer's books shall "clearly reflect" his income. Int.Rev.Code of 1939, § 41, 26 U.S.C. § 41. We think it is good business and good accounting and, therefore, ought to be good tax law to allow a reasonable estimate to be set up as a reserve for the fulfillment of this statutory obligation.
 
 
 25
 This case is like Harrold v. Commissioner, 4 Cir., 1951, 192 F.2d 1002; it is quite different from Patsch v. Commissioner, 3 Cir., 1953, 208 F.2d 532, Commissioner of Internal Revenue v. Gregory Run Coal Co., 4 Cir., 212 F.2d 52, certiorari denied 1954, 348 U.S. 828, 75 S.Ct. 47, 99 L.Ed. 653, and Jenkins v. Commissioner, 13 CCH Tax Ct. Mem. 61 (1954), affirmed per curiam 3 Cir., 1955, 217 F.2d 951.
 
 
 26
 In Patsch this Court, 208 F.2d at pages 534-535, pointed out wherein that case differed from a situation, such as that in Harrold, where a deduction for an estimated cost of rehabilitation would be allowed. Denise in fact did all the things which the taxpayer in Patsch failed to do.
 
 
 27
 The facts in Jenkins were almost identical with those in Patsch.
 
 
 28
 The controlling distinction between this case and the Patsch, Jenkins and Gregory Run cases is that in those cases there was no showing that the estimates were reasonable, while in this case such a showing was clearly made.
 
 
 29
 We think that the Commissioner and the Tax Court were incorrect on this point and the decision thereon will be reversed.
 
 
 30
 3. Diminution in Land Value.
 
 
 31
 Denise sets up a claim for diminution in the value of land on which the strip mining operations have been carried on as to either an "ordinary and necessary" expense, Int.Rev.Code of 1939, § 23(a) (1) (A), or as a loss, Int. Rev.Code of 1939, §§ 23(e) and (f). This claim was denied by the Tax Court. We think the argument has tended to make this problem harder than it is. So far as concerns land upon which the operations have been performed, the loss of value in the land is to be taken as part of the total sum which is subject to the depletion allowance. Whether the coal owner owns the fee or only mineral rights, he has an investment in that particular piece of property which is wasted by the strip mining operation. The depletion allowance, already discussed, gives him an opportunity to get back his investment. This is what the Tax Court said.
 
 
 32
 Denise also claims a loss in the value of land adjacent to that which has been strip mined. It says that the mining operation has produced piles of deposit on this land all of which will not be removed by the rehabilitation process already discussed and that some of the soil is permeated with acid which comes from water on the slag thrown up in the coal mining operations. It also says that the rehabilitation process is too expensive to be practicable and that some of the land has become nearly or entirely worthless. We think Denise's argument on this point is not well founded and that the Commissioner and the Tax Court are right.
 
 
 33
 The reason that Denise is wrong is that it has not shown any event with tax consequence to fix its claimed loss. An illustration or two will make the point clear. If a man owns a piece of real estate in a part of town where great development is going on, his real estate will increase in value year after year so long as he holds it, assuming that the development continues. But our plan of income taxation does not tax the owner on his increased value from year to year. He is richer but the tax consequence of his becoming richer does not occur until he disposes of the property.
 
 
 34
 By the same token, a taxpayer does not get a loss deduction because his piece of property decreases in value from year to year. If this man who owns the lot has the misfortune to have it in a part of town where there is no growth, but decay instead, he is undoubtedly poorer from year to year but he gets no loss until he disposes of the property by sale, abandonment, tax sale by public authorities or some other way.[6]
 
 
 35
 The same is true here. Denise did nothing about the property but claim this loss. On those parts which it sold it is, of course, entitled to claim a loss, if any, as above indicated. But just holding the property, even though it is no longer fit for the use for which it was acquired, is not enough. See Pugh v. Commissioner, 5 Cir., 49 F.2d 76, 77, certiorari denied, sub nom. Pugh v. Burnet, 1931, 284 U.S. 642, 52 S.Ct. 22, 76 L.Ed. 546.
 
 
 36
 We also agree with the Commissioner that there has been no abandonment shown here. Thus, Treas.Reg. 111 § 29.23(e)-3 is of no aid to Denise. Cf. Rhodes v. Commissioner, 6 Cir., 1939, 100 F.2d 966, and Denman v. Brumback, 6 Cir., 1932, 58 F.2d 128.
 
 
 37
 If Barry v. United States, D.C.W.D. Okl.1958, 175 F.Supp. 308, is authority to the contrary, we respectfully decline to follow it. Cf. Citizens Bank of Weston v. Commissioner, 4 Cir., 1958, 252 F.2d 425.
 
 
 38
 We think that the above discussion fits perfectly with what the Tax Court did and it will be affirmed on this point.
 
 
 39
 The decision of the Tax Court upon (1) the depletion claims and (2) the reserve for rehabilitation, will be reversed. Upon the claim for diminution, the decision is affirmed.
 
 APPENDIX
 
 40
 "STRIPPING CONTRACT
 
 
 41
 "ARTICLE OF AGREEMENT made and entered into this first day of November, A. D. 1943, by and between DENISE COAL COMPANY, a partnership, * * * party of the first part,
 
 AND
 
 42
 B. PERINI AND SONS, INC., * * * party of the second part, WITNESSETH:
 
 
 43
 "WHEREAS, the party of the first part is in possession and control of certain tracts of land and coal leases located in Stonycreek Township, Somerset County, Pennsylvania, known as the Cambria Fuel Coal properties, situated in the vicinity of Dovey, and may from time to time procure additional tracts of land and coal leases from which land party of the first part desires the party of the second part to mine, excavate and remove coal by the stripping or daylight process, in which business the party of the second part is engaged; and
 
 
 44
 "WHEREAS, the party of the second part desires to enter into an agreement whereby it shall mine, excavate, remove and load onto railroad cars coal from the tracts of land and coal leases aforesaid;
 
 
 45
 "NOW THEREFORE IT IS AGREED BY AND BETWEEN THE PARTIES HERETO AS FOLLOWS:
 
 
 46
 "1. The party of the second part agrees to excavate, mine and remove only all merchantable strippable coal that can be practicably, economically and profitably strip-mined by the party of the second part — and provided that stripping will not require continuous and systematic blasting for the removal of the overburden, — and profitably sold by the party of the first part, from the several seams of coal from the tracts of land hereinabove designated and any other nearby and contiguous tracts hereafter acquired and designated by the party of the first part. The tracts of land hereinabove designated will be available to the party of the second part for said work and said work may be commenced upon the signing of this agreement. The party of the second part shall first remove all overburden up to thirty-five (35) feet, except where the presently owned Page 8-Yard Dragline is used,a then up to forty (40) feet, and higher in both instances if the party of the second part desires to do so, provided, that the maximum overburden will not exceed a ratio of nine (9) feet of overburden to one (1) foot of merchantable coal, for which the party of the first part agrees to pay to the party of the second part compensation at the rate of One Dollar and ninety cents ($1.90)b per net ton of 2,000 pounds for all coalc mined, removed and loaded onto railroad cars adjacent or near tipple of Cambria Fuel Company, at Dovey, at site to be agreed upon by parties hereto, this price to include the mining, preparation and placing of the coal on railroad cars.
 
 
 
 d
 "If the Bituminous Coal Commission, or any other governmental body, should increase the present maximum price, or if the market price of the coal should be so increased, then it is expressly understood and agreed that the difference between the present maximum price and the selling price of said coal shall be divided equally between the party of the first part and the party of the second part, after deducting therefrom any sales commission on the price in excess of the present maximum price. If the said commission, or any other governmental body, should lower the maximum price, or if the market price should be so lowered, then the price to be paid to the party of the second part shall be mutually agreed upon by the parties to this contract.e
 
 
 
 47
 "2. The party of the second part shall prepare, clean, remove bone, and properly load all coal so that the same will be marketable. The party of the first part shall inspect all coal at the pit, and rejection of any coal by it must take place in writing at the pit, and not thereafter. All coal leaving the pit must be paid for, and no penalties or adjustments charged to the party of the second part.
 
 
 48
 "3. The party of the second part agrees to make, build, construct and maintain all structures, buildings, roads, drains and other facilities necessary for the mining, removal and transportation to and into railroad cars of the said coal, with the exception of loading docks, and/or conveyors and sidings; it being expressly understood and agreed that loading docks, and/or conveyors are to be built by the party of the second part, and sidings are to be built and maintained by the party of the first part.f
 
 
 49
 "The party of the second part agrees also to be responsible for and pay employees required at the dock for loading the coal and in the movement of the railroad cars, and keeping the tracks clean of debris and coal; provided, however, that if the party of the first part desires to further clean the coal at the dock by hand-picking, it must do so at its own expense.
 
 
 50
 "The party of the second part agrees also that if it should be necessary to drill in order to locate coal on the property aforesaid, it will do so at its own expense.
 
 
 51
 "4. The party of the second part is to do its work in a workmanlike manner.
 
 
 
 g
 "5. The party of the second part hereby agrees to indemnify and save harmless the Denise Coal Company, party of the first part, against all damages, claims, demands, cause or causes of action at law, in equity or otherwise, which may be made against Denise Coal Company arising out of the negligence or misconduct of the party of the second part or its employees in the conduct of the mining operations contemplated under this agreement.
 
 
 
 52
 "6. The party of the second part agrees to carry property damage, fire, public liability and workmen's compensation insurance, covering all the equipment and the mining operation of the coal leases contemplated under this agreement.
 
 
 53
 "7. The party of the second part hereby agrees to devote its best efforts to the stripping and excavation of as much coal as is reasonably practicable from the coal tracts aforementioned. The party of the second part hereby agrees to mine, remove and load onto railroad cars an average of at least 50,000 net tonsh of coal per month during the term of this agreement, beginning with the month of February, 1944; and it agrees to have upon the premises aforesaid, by February 1, 1944, sufficient equipment, such as stripping shovels, draglines, loading shovels, bulldozers, drilling machines, etc., to accomplish this result.i The party of the first part agrees to provide coal lands sufficient to permit the party of the second part to strip and remove the said minimum of 50,000 net tons a month, and if the coal lands specifically hereinabove mentioned are not sufficient for this purpose, then the party of the first part shall furnish other lands that generally are comparable to the lands hereinabove mentioned, in Somerset County, from which coal may be stripped by the party of the second part; provided, however, that said lands shall compare favorably as to nature and quantity of overburden, quality of coal, location of railroad loading facilities from the property, and so forth. If the party of the first part is unable to provide such other lands for stripping, then this contract may be cancelled by the party of the first part notifying the party of the second part of its inability to furnish such lands, and all of the rights of the parties hereunder shall terminate, save and except as to any payments which may be due the party of the second part by the party of the first part.j The obligations of the party of the second part hereunder shall be suspended or reduced in proportion to any interruption or delay in the mining, removal or loading of coal contemplated hereby, caused by strikes, riots, fires, floods, acts of God, failure for any reason of the party of the first part to provide railroad cars for the loading of coal, or any other cause beyond the control of the party of the second part.k
 
 
 54
 "8. The party of the first part shall remit to the party of the second part payment on the 10th day of each month for all coal mined and sold between the first and fifteenth day of the preceding month, and on the 25th day of each month for all coal mined and soldl between the fifteenth and thirtieth or thirty-first of said month.
 
 
 55
 "9. This agreement shall be in full force and effect until April 1, 1945, and shall be renewed automatically from year to year thereafter, unless either the party of the first part, or the party of the second part shall, sixty (60) days prior to April 1, in any such year, give notice in writing to the other party of its intention not to renew the agreement.
 
 
 56
 "10. No rights under this agreement shall be assigned or sub-let without the written consent of the party of the first part had and obtained.
 
 
 57
 "11. * * *
 
 
 58
 "12. It is expressly understood and agreed that the party of the first part may cancel this agreement by giving ten days written notice to the party of the second part of such intention, in either of the following events:
 
 
 59
 "(a) After February 1, 1944, if the coal contemplated under this agreement, for any reason whatsoever, cannot be sold at a profit of 10% exclusive of unusual salaries and expenses.m
 
 
 60
 "(b) If the party of the second part, during the period of three consecutive months beginning with February 1, 1944, shall fail to mine, remove and load upon railroad cars 125,000n net tons of coal in accordance with this agreement, subject, however, to the provisions of the last sentence of Section 7 of this agreement.
 
 
 61
 "It is also expressly understood and agreed that the party of the second part may cancel this agreement if it cannot excavate, mine and remove merchantable and strippable coal that can be stripmined and place on railroad cars at a profit of 10% exclusive of unusual salaries and expenses.o It is also understood and agreed that the party of the second part may cancel this agreement if the party of the first part shall default in the payment of any installment of compensation to the party of the second part, as provided in section 8 of this agreement, and said default shall continue for ten days after written notice thereof delivered to the party of the first part by the party of the second part. The exercise of said right of cancellation by the party of the second part shall be evidenced by a notice in writing delivered by the party of the second part to the party of the first part after the expiration of said ten days notice.p
 
 
 62
 "13. The party of the first part warrants the title to the lands and coal which may be designated to be stripped, as well as the right of ingress, egress and regress over and through the said properties from the pit to the docks, and will save the party of the second part harmless from any damage that should accrue to them by reason of defective title in the party of the first part. The party of the first part does not, however, warrant the quantity, quality, or existence of coal in the lands involved, or the nature of the overburden.
 
 
 63
 "* * *."q
 
 
 
 Notes:
 
 
 [1]
 In computing its gross income from its mining property for the purpose of percentage depletion in the tax years involved, Denise (hereinafter used to refer to both the partnership and the corporation which succeeded it) did not deduct from its gross "proceeds from the sales of coal" the amounts paid to the strippers. The Commissioner asserted that such amounts should have been deducted and accordingly decreased Denise's depletion allowance. The Tax Court sustained the Commissioner. 29 T.C. at pages 531-538, 546-548
 
 
 [2]
 "§ 23. Deductions from gross income
 "In computing net income there shall be allowed as deductions:
 * * * * *
 "(m) Depletion.
 "In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * *" Int.Rev.Code of 1939, § 23(m), 26 U.S. C. § 23(m) (1946 ed.).
 "§ 114. Basis for depreciation and depletion —
 * * * * *
 "(4) Percentage depletion for coal * * *
 "(A) In general.
 "The allowance for depletion under section 23(m) shall be, in the case of coal mines, 5 per centum * * * of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph.
 "(B) Definition of gross income from property.
 "As used in this paragraph the term `gross income from the property' means the gross income from mining. * * *" Int.Rev.Code of 1939, § 114(b) (4), 26 U.S.C. § 114(b) (4) (1946 ed.).
 
 
 [3]
 "Under such provisions [Secs. 23(m) and 114], the owner of an economic interest in mineral deposits or standing timber is allowed annual depletion deductions. * * * An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the severance and sale of the mineral or timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because, through a contractual relation to the owner, he possesses a mere economic advantage derived from production." Treas.Reg. 111, § 29.23 (m)-1
 
 
 [4]
 But see the discussioninfra on the cancellation features of the contracts.
 
 
 [5]
 "§ 1396.1 Exercise of police power
 "This act shall be deemed to be an exercise of the police powers of the Commonwealth for the general welfare of the people of the Commonwealth, by providing for the conservation and improvement of areas of land affected in the mining of bituminous coal by the open pit or stripping method, to aid thereby in the protection of birds and wild life, to enhance the value of such land for taxation, to decrease soil erosion, to aid in the prevention of the pollution of rivers and streams, to prevent combustion of unmined coal, and generally to improve the use and enjoyment of said lands.
 "§ 1396.2 Short title
 "This act shall be known and may be cited as the `Bituminous Coal Open Pit Mining Conservation Act.'
 * * * * *
 "§ 1396.4 Registration by operator; bond or deposit
 "Before any operator shall hereafter engage in open pit mining of bituminous coal within the Commonwealth, he shall register with the Department of Mines of this Commonwealth. * * * Contemporaneously with and as a part of said registration, the operator shall file with the Department of Mines a bond on a form to be prescribed and furnished by the department, payable to the Commonwealth and conditioned that the operator shall faithfully perform all of the requirements of this act. * * *
 * * * * *
 "§ 1396.10 Covering exposed face of unmined coal after completion of operation
 "Within one year after the operation is completed, the operator shall place sufficient overburden or earth not containing reject coal or combustible material in the open cut to cover the exposed face of the unmined coal * * * and the peaks and ridges of spoilbanks shall be leveled and rounded off to such an extent as will permit the planting of trees, grasses or shrubs. * * *
 "§ 1396.11 Planting trees, shrubs or grasses after termination of operations
 "Within three years after the operation is completed or abandoned, the operator shall plant trees, shrubs or grasses upon the land affected by open pit mining. * * *" Pa.Stat.Ann. tit. 52, §§ 1396.1 to 1396.20.
 
 
 [6]
 There are some situations where property becomes wholly valueless in the hands of the owner and he is permitted to claim a loss for tax purposes in that year. He may have a claim against a worthless debtor. See Int.Rev.Code of 1939, § 23(k). He may have shares in a corporation which become worthless. If he can show the year in which this unhappy culmination took place, he can claim it as a loss for tax purposes. See Boehm v. Commissioner, 1945, 326 U.S. 287, 66 S. Ct. 120, 90 L.Ed. 78, and Int.Rev.Code of 1939, § 23(g) (2)
 Denise would like to take advantage of this rule, but carefully does not make its claim broad enough to come within it. It says that the property became worthless for the purpose for which it was acquired, not that it became worthless altogether. This is not enough.
 
 
 a
 None of the other contracts contain any such reference to present equipment being used on a tract
 
 
 b
 The rate varies from contract to contract
 
 
 c
 Sanders, Bozeman No. 1, Bozeman No. 2 and Juliette No. 2 refer to "merchantable coal."
 
 
 d
 Bozeman No. 1, Bozeman No. 2 and Juliette No. 2 contain an additional provision before this paragraph: "Both parties to this agreement are governed by market conditions, and this contract is subject to same. If the party of the first part fails to sell all the coal produced by the party of the second part, the party of the second part, may at its option, after twenty-four (24) hours written notice to the party of the first part, sell in its own name the coal at OPA ceiling prices or market prices agreed upon by both parties, and upon receipt of payment remit to the party of the first part the amount above the contract price, to wit Two Dollars ($2.00) per net ton, and any sales commission not to exceed twenty cents (20¢) per net ton."
 
 
 e
 Juliette No. 1 does not contain this paragraph
 
 
 f
 In Sanders, it is also agreed that tipples are to be built by Denise, and that loading docks and/or conveyors and tipples are to be maintained by Denise
 Bozeman No. 1 provides that Denise will build tipples or docks and sidings and that Bozeman will maintain the tipples or docks with Denise maintaining the sidings and manning the docks.
 In Bozeman No. 2 there is no "except" clause. Bozeman agrees to man and maintain the tipple (which has now been built by Denise). Denise agrees to maintain the sidings. By subsequent modification, Denise agrees to man and maintain the tipple and docks as well as to maintain the sidings.
 In Juliette No. 1, the provision appears in shortened form: "The party of the second part agrees to make, build, construct, and maintain all roads, drains and other facilities necessary for the mining, removal and transportation of the coal except at the tipple. The party of the second part will also construct any buildings necessary for its own use."
 Juliette No. 2 has a provision identical to the original provision in Bozeman No. 2.
 
 
 g
 Sanders contains the following provision before this paragraph: "The party of the second part agrees that this is not an exclusive contract for the mining of coal on the property set forth above." See also note qinfra.
 
 
 h
 The amount varies
 
 
 i
 Bozeman No. 2 makes no reference to equipment in this provision
 
 
 j
 The provisions in text from note i to this point are omitted in Juliette No. 1
 
 
 k
 Juliette No. 2 omits this paragraph
 
 
 l
 Bozeman No. 1 speaks of "all coal mined and delivered to tipple." Bozeman No. 2 and Juliette No. 2 speak of "all coal mined and loaded into railroad cars."
 
 
 m
 Bozeman No. 1 and Bozeman No. 2 do not contain this 10% provision
 
 
 n
 The amount varies
 
 
 o
 Bozeman No. 1 and Bozeman No. 2 do not contain this 10% provision
 
 
 p
 Juliette No. 2 contains nothing comparable to section 12 of Perini; it has no cancellation provisions
 
 
 q
 Bozeman No. 1, Bozeman No. 2 and Juliette No. 2 contain an additional express provision: "The contract is not exclusive." See note gsupra for a similar provision in Sanders. Juliette No. 2 also provides that Denise will reimburse Juliette for all costs of moving and erecting a 5-yard Page Dragline on Denise's property.