*Decision will be entered under Rule 50.*

THE MARQUARDT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74983. Filed November 27, 1962.

*Sidney H. Wall, Esq.*, for the petitioner.
*James Q. Smith, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in petitioner's income tax for the calendar years 1952 and 1953 in the amounts of $362,847.34 and $424,893.38, respectively, and overassessments for the calendar years 1951 and 1954 in the amounts of $9,809.81 and $369,568.46, respectively.

The issues for decision are as follows:

(1) Whether petitioner was required to accrue amounts which it had no fixed or unconditional right to;

(2) Whether petitioner changed its method of accounting for certain retainages; and

(3) Whether respondent erred in including the amount of certain termination claims in petitioner's income.

FINDINGS OF FACT.

Some of the facts have been stipulated and are hereby found as stipulated.

The petitioner, The Marquardt Corporation[1] (hereinafter sometimes referred to as Marquardt) has its principal place of business at Van Nuys, California. For the calendar years 1952 and 1953, petitioner filed corporate income tax returns with the district director of internal revenue, Los Angeles, California. Petitioner maintained its books and records predominantly on an accrual method of accounting.

### Issue 1. Subcontract with Boeing.

In 1951, petitioner entered into a cost-plus-fixed-fee subcontract (hereinafter referred to as the subcontract) with the Boeing Airplane Company (hereinafter referred to as Boeing). Previously, Boeing had received a prime contract from the United States Air Force to do certain research and development work. Both the Boeing prime contract and petitioner's subcontract were subject to termination at the Government's convenience. The pertinent parts of the subcontract are as follows:

ARTICLE 2. *Estimated Cost and Fixed Fee.*

The estimated cost of the work to be performed by Subcontractor hereunder is $6,110,846.00 and the fixed fee therefor is $427,759.00.

ARTICLE 3. *Consideration.*

(a) Boeing will, subject to the limitations set forth in ARTICLE 6, hereof, pay Subcontractor upon satisfactory performance of all services and delivery

---

[1] Prior to May 8, 1959, petitioner had been doing business as the Marquardt Aircraft Co.

of all items specified in this Subcontract, subject to reimbursement for costs as outlined in ARTICLE 6, hereof, the cost as approved by the Contracting Officer, plus a fixed-fee of $427,759.00, being seven (7%) per cent of the total estimated cost. The estimated cost and the fixed-fee are subject to increase or decrease resulting from changes as provided in ARTICLE 5, hereof; provided, however, that there shall be no adjustment in the amount of the fixed-fee as provided for herein because of any errors and/or omissions made in computing the original estimated cost of the work or where the estimated cost varies from the actual cost.

*　　*　　*　　*　　*　　*　　*

ARTICLE 5. *Changes.*

Boeing may at any time, by a written order, make changes in or additions to the drawings and specifications, issue additional instructions, require additional work or direct the omission of work covered by this subcontract. If such changes cause a material increase or decrease in the amount or character of the work to be done under this subcontract, or in the time required for its performance, an equitable adjustment of the estimated cost, the amount of the fixed-fee to be paid to Subcontractor and the delivery schedule shall be made and the subcontract shall, with the approval of the Contracting Officer, be modified in writing accordingly. Any claim for adjustment under this Article must be asserted within thirty (30) days from the date the change is ordered or within such further time as may at any time be agreed to in writing by the parties, and if the parties fail to agree upon the adjustment to be made, such claim shall be determined as provided in Article 16 hereof. Nothing provided in this article shall excuse Subcontractor from proceeding with the prosecution of the work so changed.

ARTICLE 6. *Payments.*

(a) *Reimbursement for Cost.* Boeing will currently reimburse Subcontractor or cause Subcontractor to be reimbursed for allowable items of cost incurred by it under this subcontract as may be approved or ratified by the Contracting Officer, whose determination with respect thereto shall be final and binding except as provided in Article 3(e), Article 16 hereof, and this paragraph, and upon certification to and verification by the Contracting Officer of the original signed payrolls for labor, the original paid invoices for materials or other original papers, provided, however, that subject to the requirements of paragraph (b) of Article 7 hereof, in respect to the maintenance so far as practicable of a complete separate system of accounts for work under this subcontract, in the event it be impracticable to furnish the Contracting Officer with the original signed payrolls for labor, original paid invoices for materials, or other original papers, Subcontractor shall furnish evidence in a form satisfactory to the Contracting Officer covering expenditures to be reimbursed under this Article. Payment by Boeing shall be made against commercial invoices of Subcontractor as approved by the Contracting Officer. Generally, reimbursement will be made monthly but may be made at more frequent intervals if the conditions so warrant. Disagreement as to whether any cost or expenditure is an allowable item of cost under Article 3 hereof, or as to the right of Subcontractor to reimbursement for any cost or expenditure made by it, shall be deemed a dispute "concerning a question of fact" under the terms of Article 16 hereof. Subcontractor shall, upon request, promptly furnish Boeing copies of any papers or certificates furnished by Subcontractor under this paragraph to the Contracting Officer which Boeing may be required to furnish the Government under the Prime Contract.

(b) *Payment of the Fixed Fee.* Ninety per cent (90%) of the fixed fee to be paid pursuant to paragraph (a) of Article 3 hereof, as such fee may be in-

creased or decreased from time to time, shall be paid as it accrues, in monthly installments based upon the percentage of the performance of the work as determined from estimates made and approved by the Contracting Officer. Upon completion of the work under this subcontract and its final acceptance, any unpaid balance of the fee, including the additions thereto, if any, to which Subcontractor may be entitled, as provided in said paragraph (a) of Article 3, shall be paid to Subcontractor.

(c) By reason of the limitation on the amount of Government funds available for the performance of the Prime Contract, the total amount of funds allocated by Boeing for the performance of this subcontract is $1,400,000.00. This sum may be increased from time to time by Boeing at its sole discretion. Subcontractor will be advised in writing of any such increase. Boeing shall not be obligated to pay Subcontractor either by way of reimbursement of allowable items of cost or as fixed fee or otherwise any amount in excess of the amount above specified, or the amount to which it has been increased as above provided. Notwithstanding any other provision of the subcontract, Subcontractor shall not take any action in the performance of this subcontract that would, but for the terms hereof, result in Boeing's being obligated to pay Subcontractor any greater amount than that above provided and the obligation of the Subcontractor to proceed with the performance of this subcontract shall be limited accordingly. If at any time Subcontractor has reason to believe that the amount to be expended by it in the next succeeding thirty (30) days, when added to all previous expenditures and to the proportionate amount of Subcontractor's fixed fee applicable to the work performed will exceed the amount above mentioned, or as the same may have been increased, it shall notify Boeing to that effect so that an appropriate increase in said amount may, if Boeing so elects, be allocated to this subcontract. Anything in this subcontract to the contrary notwithstanding, Boeing shall not be obligated to pay Subcontractor either for reimbursement of expenditures or fixed fee or otherwise, any amount in excess of the amount allocated to this subcontract as above provided; provided, however, if Subcontractor makes expenditures in excess of said amount, Boeing may, with the approval of the Contracting Officer, ratify and pay such expenditures.

At various dates, pursuant to Article 5, the subcontract was amended by supplemental agreements. With the exception of Supplemental Agreement No. 1, each one expressly provided that it would have no force or effect until approved by the contracting officer.[2] A number of the supplements increased or changed the work to be performed by petitioner. Correspondingly, the estimated cost of the work and petitioner's fixed fee was also changed. In addition, some of the supplements increased the amount which petitioner was authorized to expend under Article 6(c), *supra*. Supplemental Agreement No. 10, dated May 21, 1953, and approved by the contracting officer June 19, 1953, increased the amount petitioner was authorized to spend to $6,750,000. This was a cumulative amount and included both expenditures and the fixed fee. Supplemental Agreement No. 11, dated July 15, 1953, and approved by the contracting officer August 19, 1953,

---

[2] The contracting officer was assigned to and stationed at Boeing's plant in Seattle, Washington. He was either an Air Force officer or a civilian employee of the Government authorized to act in that capacity.

did not affect or increase the aforementioned amount. No other agreement increasing the amount petitioner was authorized to spend was executed by Boeing and petitioner in 1953.

Supplemental Agreement No. 12, which authorized petitioner to spend $7,965,000, was not submitted until February 12, 1954. It was not until March 5, 1954, that the contracting officer approved it.

For the years ending prior to January 1, 1953, petitioner had expended sums and recorded fees, in the performance of the subcontract, totaling $4,317,212.95. Notwithstanding the fact that Boeing had only authorized petitioner to spend $6,750,000, petitioner, during 1953, expended additional sums and recorded fees on its books,[3] which, when aggregated with the prior expenditures and fees amounted to $8,050,517.09.

Petitioner's books indicated that, in 1953, it had sales of $8,830,-443.74.[4] For tax purposes, in 1953, this amount was reduced by a reserve for cost disallowances in the amount of $42,991.41 and by a Schedule M adjustment [5] in the amount of $1,257,525.68. The purpose of the Schedule M adjustment was to limit the amount included in income from the subcontract to the cumulative amount of $6,750,000.

Respondent disallowed the reserve for cost disallowances and petitioner concedes this was correct. As a result of adding $42,991.41 back to sales, the Schedule M adjustment would have been $1,300,-517.09. However, respondent has conceded that sales should be reduced by $157,122.10, the costs applicable to the subcontract that were actually disallowed. With the concession, the Schedule M adjustment would have been $1,143,394.99 under petitioner's theory of the case.

Petitioner continued to bill Boeing for its costs and for 90 percent of its recorded fees. As of December 31, 1953, petitioner had billed Boeing for costs and fees in the aggregate amount of $7,621,521.08. By December 31, 1953, Boeing had paid petitioner approximately $259,000 in excess of the $6,750,000 specified in Article 6(c) as amended by Supplemental Agreement No. 10. In January 1954, Boeing paid petitioner the further sum of $394,562.33. Thereafter Boeing made no further payments to petitioner until after March 5, 1954; the date on which Supplemental Agreement No. 12 was approved by the contracting officer.

In his notice of deficiency, the Commissioner determined that petitioner "erroneously adjusted the income shown on [its] books by the

---

[3] $3,733,304.14.

[4] This amount included $3,733,304.14, the total amount expended and fee recorded in performing the subcontract in 1953.

[5] Schedule M is contained in the Corporate Income Tax Return, Form 1120, and is used to reconcile the tax return with the taxpayer's books.

amount of $1,257,525.68 for contract expenditures in excess of authorized amounts" and increased petitioner's sales and its net income for the year 1953 by said amount of $1,257,525.68.

### Issue 2.   Fixed Fee Retentions.

Petitioner was and had been engaged in the performance of a number of cost-plus-fixed-fee contracts.   A typical clause contained in those contracts concerning the payment of the fixed fee is as follows:

Ninety percent (90%) of the fixed fee shall be paid in installments at the time of each payment on account of allowable cost; the amount of each installment thus payable is to be equal to the proportion of the said ninety percent (90%) that the related payment on account of allowable cost bears to the total estimated cost of performance of this contract.   Upon completion and final acceptance of the contract the unpaid balance of the fixed fee, subject to any adjustment thereof which may be made as provided herein, shall be paid to Vendor.

In compliance with the foregoing provision, petitioner only billed its customers for 90 percent of the fixed fee during the course of a contract.   When the contract was completed and accepted petitioner billed the customer for the remaining 10 percent (hereinafter sometimes referred to as the 10 percent holdback or 10 percent retainage).

During the years 1949 through 1953, petitioner accrued, on its books and included in its tax returns, 100 percent of the fixed fee applicable to that portion of its contracts which had been completed, rather than the 90 percent billed to its customers.   The following schedule indicates the net amount of the 10 percent holdback applicable to the years 1952 and 1953 on uncompleted contracts:

| Year | Holdback at Jan. 1 | Holdback at Dec. 31 | Net holdback for year |
|------|-------------------|--------------------|----------------------|
| 1952 | $30,580.65 | $62,532.74 | $31,952.09 |
| 1953 | 62,532.74 | 95,800.42 | 33,267.68 |

On its income tax returns for 1952 and 1953, petitioner reduced its sales by a "Reserve for Unearned Fee" and claimed a deduction for the addition to the reserve in each year.   In the notice of deficiency, the respondent disallowed the deductions for the additions to the reserve.

### Issue 3.   Termination Claims.

During the taxable year 1953, petitioner was engaged in the performance of a number of contracts that were subject to termination

by or for the convenience of the Government. The following eight contracts were so terminated.

| Contract code | Customer | Date of termination |
|---|---|---|
| 67 | Westinghouse Electric Corp | Sept. 3, 1953 |
| 79 | Westinghouse Electric Corp | Sept. 3, 1953 |
| 83 | Westinghouse Electric Corp | Sept. 3, 1953 |
| 84 | Westinghouse Electric Corp | Sept 3, 1953 |
| 4299 | Westinghouse Electric Corp | Sept. 3, 1953 |
| 4301 | Westinghouse Electric Corp | Sept. 3, 1953 |
| 30 | Grumman Aircraft Co | Aug. 7, 1953 |
| 72 | McDonnell Aircraft Co | Feb. 12, 1953 |

As of December 31, 1953, petitioner's sales on its books included $105,792.19 representing the amount of unsettled termination claims under the aforementioned contracts. On its income tax return for 1953, petitioner excluded this amount from sales. The foregoing amount was net of progress payments and in most instances represented petitioner's claims prior to reduction for disposal credits.[6]

Each of petitioner's subcontracts with Westinghouse Electric Corporation (hereinafter referred to as Westinghouse) contained the following termination clause:

Article —. (a) The buyer may terminate work under this order in whole or in part at any time by written or telegraphic notice, whenever, without the fault of the buyer, (1) the Government requests the termination of this order or (2) a contract between the buyer and a third person requiring for its performance articles or services of the kind or type covered by this order is terminated, in whole or in part, or amended to eliminate or reduce such requirements. Such notice shall state the extent and effective date of such termination; and, upon the receipt thereof, the seller will, as and to the extent directed by the buyer, stop work under this order and the placement of further orders or subcontracts hereunder, terminate work under orders and subcontracts outstanding hereunder, and take any necessary action to protect property in the seller's possession in which the buyer has or may acquire an interest.

(b) If the parties cannot by negotiation agree within a reasonable time upon the amount of fair compensation to the seller for such termination, the buyer in addition to making prompt payment of amounts due for articles delivered or services rendered prior to the effective date of termination, will pay to the seller the following amounts without duplication:

(1) The contract price for all articles or services which have been completed in accordance with this order and not previously paid for.

---

[6] Disposal credits have to do with inventory items on hand at the time the contract is terminated and are generally disposed of by sale to outside bidders. The items consist of such things as dies, scrap, and unused parts.

(2) (i) The actual costs incurred by the seller which are properly allocable or apportionable under recognized commercial accounting practices to the terminated portion of this order, including the cost of discharging liabilities which are so allocable or apportionable, and (ii) a sum equal to 2% of the part of such costs representing the costs of articles or materials not processed by the seller, plus a sum equal to 8% of the remainder of such costs, but the aggregate of such sums shall not exceed 6% of the whole of such costs. For the purpose of subdivision (ii) such costs shall exclude any charge for interest on borrowings and shall exclude the cost of discharging liabilities for parts, materials and services not received by the seller before the effective date of termination.

(3) The reasonable costs of the seller in making settlement hereunder and in protecting property in which the buyer has or may acquire an interest.

Payments made under this paragraph (b), exclusive of payments under subparagraph (3), shall not exceed the aggregate price specified in this order, less payments otherwise made or to be made.

(c) With the consent of the buyer, the seller may retain at an agreed price or sell at an approved price any completed articles, or any articles, materials, work in process or other things the cost of which is allocable or apportionable to this order under paragraph (b) (2) above, and will credit or pay the amounts so agreed or received as the buyer directs. As directed by the buyer, the seller will transfer title to, and make delivery of, any such articles, materials, work in process or other things not so retained or sold. Appropriate adjustment will be made for delivery costs or savings therein.

(d) The provisions of this Article — shall not limit or affect the right of the buyer to terminate this order for the default of the seller.

The provisions of the McDonnell Aircraft Co. (hereinafter referred to as McDonnell) termination clause were essentially similar to those included in the Westinghouse contracts. See section VIII, Armed Services Procurement Regulations.

Petitioner's contract with Grumman Aircrafts Co. (hereinafter referred to as Grumman) contained the following termination clause:

ARTICLE VII  TERMINATION

(A) It is agreed that Grumman may terminate this contract by notice in writing if Vendor refuses, neglects, or fails to prosecute the work or any phase thereof with such diligence as will insure its completion within the time specified or any extension in writing thereof, or if Vendor fails to complete said work within such time, or if Grumman's prime contract shall have been cancelled or curtailed by the United States Government. Upon receipt of such notice of termination Vendor shall immediately discontinue all work and the placing of all orders for materials, facilities, and supplies in connection with the performance of this contract. Vendor shall proceed to cancel promptly all its existing orders and work charges to this contract on the best terms available.

(B) Upon the termination of this contract under the provisions hereof full and complete adjustment of payment of all amounts due Vendor arising out of this contract as determined by an audit conducted by or for Grumman or the United States Government shall, as soon as practicable after such termination, be made as follows:

1. Grumman shall reimburse Vendor for all proper costs incurred in the performance of this contract and in the cancellation hereof.

2. Grumman shall pay to Vendor in lieu of the fixed fee herein provided, a percentage of such fixed fee which shall be proportionate to the percentage of the contract completed at the date of cancellation, less such amounts as shall heretofore have been paid to Vendor on account of said fee, provided, however, that with respect to any termination resulting from default of Vendor the fixed fee payable shall be only that portion of the total fixed fee that the estimated cost of the work performed to date of termination shall bear to the total estimated cost.

In the notice of deficiency, respondent determined that the $105,792.19, representing the amount of unsettled claims on terminated contracts at December 31, 1953, constituted gross income under section 22 of the 1939 Code and increased petitioner's income by that amount.

Respondent concedes that there was an incorrect computation of the excess profits credit in the notice of deficiency. The concessions of the parties will be taken into account under a Rule 50 computation.

OPINION.

### Issue 1. Subcontract with Boeing.

As of December 31, 1953, Boeing had authorized petitioner to spend the cumulative total of $6,750,000 on the subcontract. This included both expenditures and the fixed fee. Notwithstanding this limitation, petitioner expended sums and recorded fees on its book in excess of that amount. On its Federal income tax return for 1953, petitioner, by means of a Schedule M adjustment, reduced its sales by $1,257,525.68 [7] (hereinafter referred to as the Schedule M adjustment). The issue before us is whether all or any part of the $1,143,394.99 is includable in petitioner's income in 1953.

In 1953, petitioner received $259,000 in excess of the amount Boeing had authorized it to spend. With the exception of the foregoing amount, discussed *infra*, we agree with petitioner that it was not required to accrue, in 1953, any amount in excess of that authorized by Boeing.

Under the accrual method of accounting, an item of income accrues when the taxpayer has a fixed or unconditional right to receive it. It is the right to receive and not the actual receipt of an amount which determines its accruability. *Spring City Co.* v. *Commissioner*, 292 U.S. 182 (1934); *Estate of Putnam* v. *Commissioner*, 324 U.S. 393 (1945). Until the right to an amount becomes accruable through the fixing of the right to receive, the taxpayer is under no obligation to return it as income.

We are concerned with the facts as they existed on December 31, 1953. *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359 (1931). As of

[7] Taking the concessions of the parties into account, the amount would have been $1,143,394.99.

that date, petitioner had no fixed or unconditional right to receive any sum in excess of that authorized by Boeing. While it is true that Boeing, in 1954, did pay petitioner additional sums of money and did allocate additional funds, these subsequent events cannot alter the facts as they stood on December 31, 1953. The Supreme Court stated in *Healy* v. *Commissioner*, 345 U.S. 278, 284, 285 (1953) that:

It would be disruptive of an orderly collection of the revenue to rule that the accounting must be done over again to reflect events occurring after the year for which the accounting is made, and would violate the spirit of the annual accounting system. This basic principle cannot be changed simply because it is of advantage to a taxpayer or to the Government in a particular case that a different rule be followed.

There is little doubt that petitioner hoped and desired that it would get paid. However, this is not the test of accruability. The question is whether petitioner had a fixed or unconditional right. *Spring City Co.* v. *Commissioner, supra.*

Notwithstanding the provisions of the contract and the facts, respondent contends that the entire amount of the Schedule M adjustment should be included in petitioner's income in 1953. Respondent claims that this is a "case of balancing income and deductions." Respondent states that "The income, in fact, arises out of and because of deductions and is, indeed, identical with the deductions." To support this view respondent cites the following excerpt from *Daley* v. *United States*, 243 F. 2d 466, 471 (C.A. 9, 1957) : "We again emphasize that the controlling point is the time the costs and revenue from the contract are matched, and net income or loss ascertained."

This contention might have some relevance *if* petitioner were using the completed contract method of accounting, to which *Daley* v. *United States, supra*, had specific reference. Since petitioner is on the accrual method, this principle can have no application here.

Respondent next contends that petitioner customarily overexpended and Boeing customarily overpaid the authorized amounts. Respondent contends that there was no substantial contingency barring petitioner's right to receive and Boeing's obligation to pay the amount in dispute.

The facts do not support this contention. Even if petitioner had customarily overexpended, this unilateral action would not fix Boeing's obligation to pay, the thing necessary to require accrual. The evidence shows that it was the end of 1953, some 2½ years after work was begun on the subcontract, that Boeing first paid an amount in excess of that which it had authorized. Furthermore, respondent's argument overlooks the fact that the discretion to pay or not was in *Boeing*, not **petitioner.**

Respondent's next contention is that the elimination of the Schedule M adjustment from income distorts petitioner's income for 1953. Respondent alleges that he has determined a deficiency because the elimination of the Schedule M adjustment from income will not clearly reflect income. Respondent states that "There is no possible way that income can be clearly reflected than to match income against the costs giving rise to such income in the case of a cost plus fixed fee contract."

There is no merit in this contention.

Respondent has not attempted to change petitioner's overall method of accounting because it did not clearly reflect income. His attempt has been to place income in a year in which it did not accrue. Respondent seems to be laboring under the misapprehension that the principles which apply to the completed contract method apply equally as well to an accrual basis taxpayer. Accrual of an item as income in a particular year is not required merely because the expenses attributable to that item were deducted from gross income in that year. *Foster Wheeler Corporation,* 20 T.C. 15 (1953); *Globe Corporation,* 20 T.C. 299 (1953); *Breeze Corporations* v. *United States,* 117 F. Supp. 404 (Ct. Cl., 1954). As a practical matter, the income tax laws must operate on an annual basis, and there is no assurance under either an accrual or cash basis of accounting that there will be complete correlation between items of income and deductions pertinent thereto. *Automobile Club of New York, Inc.,* 32 T.C. 906 (1959), affd. 304 F. 2d 781 (C.A. 2, 1962); *Guardian Inv. Corp.* v. *Phinney,* 253 F. 2d 326 (C.A. 5, 1958); *H. G. Irby, Jr.,* 30 T.C. 1166 (1958), affirmed per curiam on this ground 274 F. 2d 208 (C.A. 5, 1960); *Michael Drazen,* 34 T.C. 1070 (1960).

Respondent argues that if this Court should find and hold that the Schedule M adjustment is not income until actually received in 1954, then and in that event, section 43 of the 1939 Code [8] commands that the costs which give rise to that income should be permitted as deductible cost in 1954 in order to clearly reflect income. Respondent contends that "Possibly in recognition that the ideal method of matching income against the deductions giving rise thereto * * * might be frustrated by limitations of the annual accounting system, and in recognition that in a going business of any magnitude there are overlapping items both of income and deductions which could distort income, * * * Congress gave the Commissioner authority to

---

[8] SEC. 43. PERIOD FOR WHICH DEDUCTIONS AND CREDITS TAKEN.

The deductions and credits (other than the corporation dividends paid credit provided in section 27) provided for in this chapter shall be taken for the taxable year in which "paid or accrued" or "paid or incurred," dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period. * * *

apply deductions or credits in years different than the year 'paid or accrued' or 'paid or incurred' in accordance with the system of accounting used by the taxpayer if in order that income might clearly be reflected 'the deductions or credits should be taken as of a different period.' Sec. 43, I.R.C. 1939, as amended."

There is no merit in this argument. We have not held and petitioner has not argued that the income in question should be reported when it is received. We have held that the income in question accrues in the year petitioner's right to receive it becomes fixed or unconditional.

Aside from the fact that neither the deficiency notice nor respondent's answer disallowed any expenses attributable to the disputed income, there is a more cogent reason why respondent's argument must fail. In 1944, the Supreme Court in *Security Mills Co.* v. *Commissioner*, 321 U.S. 281 (1944), specifically rejected the argument now urged upon us. The Court stated at pages 284–287:

Petitioner nevertheless insists that § 43 of the Revenue Act, which requires that deductions be taken for the taxable year in which the amount was paid or accrued, creates an exception applicable to this case by its concluding clause, "unless in order to clearly reflect the income the deductions or credits should be taken as of a different period." In short, the petitioner's position is that the Commissioner and the Board of Tax Appeals are authorized and required to make exceptions to the general rule of accounting by annual periods wherever, upon analysis of any transaction, it is found that it would be unjust or unfair not to isolate the transaction and treat it on the basis of the long term result. We think the position is not maintainable.

The Revenue Act of 1921, in §§ 214 (a) (6) and 234 (a) (4) authorized the Commissioner to allow the deduction of losses in a year other than that in which sustained when, in his opinion, that was necessary clearly to reflect income. The qualifying clause of § 43 was first added as § 200 (d) of the Revenue Act of 1924. The reports of both House and Senate Committees concerning this change said:

"The proposed bill extends that theory to all deductions and credits. The necessity for such a provision arises in cases in which a taxpayer pays in one year interest or rental payments or other items for a period of years. If he is forced to deduct the amount in the year in which paid, it may result in a distortion of his income which will cause him to pay either more or less taxes than he properly should."

From these reports it is clear that the purpose of inserting the qualifying clause was to take care of fixed liabilities payable in fixed installments over a series of years. For example, a tenant would not be compelled to accrue, in the first year of a lease, the rental liability covering the entire term nor would he be permitted, if he saw fit to pay all the rent in advance, to deduct the whole payment as an expense of the current year. But we think it was not intended to upset the well-understood and consistently applied doctrine that cash receipts or matured accounts due on the one hand, and cash payments or accrued definite obligations on the other, should not be taken out of the annual accounting system and, for the benefit of the Government or the taxpayer, treated on a basis which is neither a cash basis nor an accrual basis, because so to do would,

in a given instance, work a supposedly more equitable result to the Government or to the taxpayer.

\* \* \* \* \* \* \*

This legal principle has often been stated and applied. The uniform result has been denial both to Government and to taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, or, applying the accrual basis, the year in which the right to receive, or the obligation to pay, has become final and definite in amount.

\* \* \* \* \* \* \*

We are of opinion that the purpose of the language which Congress used was not to substitute, whenever in the discretion of an administrative officer or tribunal such a course would seem proper, a divided and inconsistent method of accounting not properly to be denominated either a cash or an accrual system.

Respondent's final argument is that in any event, to the extent that petitioner was actually paid $259,000 in excess of the authorized $6,750,000, petitioner should be required to include this in income in 1953. Respondent contends that income received under a claim of right without restriction in respect of its use or disposition constitutes taxable income, even though it may thereafter be adjudged liable to restore it or its equivalent. *North American Oil* v. *Burnet*, 286 U.S. 417 (1932) ; *Brown* v. *Helvering*, 291 U.S. 193 (1934).

Petitioner alleges that its officers were aware, at the time of receipt of the $259,000 that there was a potential obligation to repay this amount. Petitioner contends, therefore, that it did not receive this money under a claim of right and consequently it is not includable in its income for 1953.

We agree with the respondent on this point. It seems clear that petitioner received this money under a claim of right and without restriction on its use and it should be included in income in 1953.

This is so even though petitioner might subsequently be required to return all or part of it. *North American Oil* v. *Burnet, supra; Healy* v. *Commissioner, supra; United States* v. *Lewis*, 340 U.S. 590 (1951).

*Issue 2. Fixed Fee Retentions.*

On its income tax returns for 1952 and 1953, petitioner reduced its sales by a "Reserve for Unearned Fee" and claimed a deduction for the addition to the reserve for each year. Respondent disallowed these deductions for additions to the reserve and petitioner now concedes the correctness of this action.

As an alternative proposition, petitioner contends that the 10 percent holdback did not accrue until the contracts were completed and finally accepted, therefore, these amounts were not includable in income in 1952 and 1953. To support this contention petitioner relies on *Charles F. Dally*, 20 T.C. 894 (1953), affd. 227 F. 2d 724 (C.A. 9, 1955), certiorari denied 351 U.S. 908 (1956), and *United States* v.

*Harmon*, 205 F. 2d 919 (C.A. 10, 1953). Petitioner also contends that it is not attempting to change its method of accounting without the consent of the Commissioner. Petitioner points out that it has at all times used the accrual method of accounting. Petitioner contends that it now seeks only to correct its tax returns by exclusion of the so-called "10% holdbacks" and to apply correctly for the first time the accounting method which it has followed from the beginning.

The respondent would have us find that petitioner is seeking to change its method of accounting and that petitioner must secure the consent of the Commissioner for such a change. Cf. *Wright Contracting Co.*, 36 T.C. 620 (1961) on appeal (C.A. 5). Section 39.41–2(c), Regs. 118, provides that a taxpayer who changes his method of accounting shall, before computing his income upon such method, secure the Commissioner's consent.

While there is language in the *Wright Contracting Co.* opinion that appears to support the respondent's position, the matter has since been thoroughly considered in *American Can Co.*, 37 T.C. 198 (1961) on appeal (C.A. 2). The principles set forth in the *American Can Co.* case require our holding that a taxpayer on the accrual method of accounting is entitled to have its income computed in accordance with that method by revising the treatment of an item which theretofore had not been correctly accrued, and that such revision or correction may be made without the necessity of seeking the Commissioner's consent. We are constrained to follow the *American Can Co.* case here.

The 10 percent holdbacks involved here did not accrue until the contracts were completed and finally accepted. *Charles F. Dally*, *supra; United States* v. *Harmon, supra.* Therefore, they were not includable in petitioner's 1952 and 1953 income, and petitioner was entitled to correct his accounting treatment of these amounts accordingly.

### Issue 3. Termination Claims.

During the taxable year 1953, petitioner was engaged in the performance of a number of contracts which were terminated for the convenience of the Government. As of December 31, 1953, $105,792.19 was included in petitioner's sales, for book purposes, representing termination claims under the aforementioned contracts. On petitioner's tax return this amount was excluded from sales. In the notice of deficiency, respondent determined that the $105,792.19 constituted gross income under section 22 of the 1939 Code and increased petitioner's income by that amount.

Petitioner contends that the termination claims did not accrue in 1953 because they were contingent and subject to negotiation and accordingly did not represent fixed rights to receive determinable

amounts of income. Petitioner contends that in no sense can the settlements of these claims, all of which were achieved in subsequent years, be regarded as mere ministerial acts or computations under a specific formula as was involved in *Continental Tie & L. Co.* v. *United States*, 286 U.S. 290 (1932). Petitioner argues that this conclusion is reinforced by the fact that the settlement of the claims in question in fact consumed a considerable amount of time, the dates of settlement ranging from March 26, 1954, to April 11, 1958, and that all but one of the claims were settled on the basis of a different dollar amount than that reflected on petitioner's books as of December 31, 1953. Moreover petitioner alleges, the settlements were accomplished only after a considerable amount of negotiation and correspondence.

We cannot agree with petitioner's contention.

It is true that it took several years for petitioner to receive payment on some of the termination claims. However, these claims were being reported on an accrual basis and it is the *right to receive* and not the actual receipt of an amount that determines accruability. *Spring City Co.* v. *Commissioner, supra; Estate of Putnam* v. *Commissioner, supra.* The exact amount need not be determined. It is sufficient that all the facts upon which the calculation depends have become fixed. *Lucas* v. *American Code Co.*, 280 U.S. 445 (1930). Then the computation may be unknown, but it is not unknowable. *Frost Lumber Industries* v. *Commissioner*, 128 F. 2d 693 (C.A. 5, 1942).

Petitioner seems to imply that the final settlements were different from the original proposals because of negotiations and contingencies. We do not find this to be the case. The evidence indicates that it was the way in which the claims were submitted that caused the majority of differences. On its first settlement proposal on a particular contract, petitioner did not always submit all the claims it had relating to that contract. Its main concern was with getting paid as quickly as possible. In addition, the disposal credits [9] had to be taken into consideration. In the ordinary course of events, accounts are often settled on different bases, but this does not mean there was no fixed right to a reasonably ascertainable amount.

Although the Westinghouse contracts provided for negotiation as to reasonable compensation, they also provided a specific formula for determining the profit if no agreement could be reached. Thus, petitioner did have fixed or unconditional rights under the contracts. The evidence indicates that the amount of petitioner's claim, with

[9] When a contract was terminated, there was generally certain material on hand. This was sold and the proceeds credited against the amount due under the contract. These credits were known as disposal credits.

regard to a particular contract, was determined by adding the expenses recorded on its books and the fixed fee. The fixed fee was determined by multiplying the overall fixed fee by the percentage of completion of the contract.

The provisions of the McDonnell contract were not introduced into evidence; however, the telegraphic contract refers to section VIII of the Armed Forces Procurement Act. After examining that portion of the Act, we find nothing there that would lead us to a conclusion different from that in the Westinghouse contracts.

The Grumman contract does not refer to any negotiations. It states that full and complete adjustment of payment of all amounts due petitioner shall be made and sets forth the method by which it was to be done.

Although there was correspondence between petitioner and the other contractors, there does not appear to have been any serious dispute as to any amounts involved. It was also indicated by one of petitioner's witnesses that processing through Government agencies caused a great deal of the delay.

*Breeze Corporations* v. *United States, supra,* and *Apex Electrical Manufacturing Co.,* 16 T.C. 1171 (1951), affd. 202 F. 2d 151 (C.A. 6, 1953), are distinguishable. The courts there found that the Contract Settlement Act of 1944 did not give the taxpayer a fixed right to any amount. However, the contracts before us did give petitioner a fixed right to a reasonably ascertainable amount.

We hold that respondent's determination on this issue was correct. *Continental Tie & L. Co.* v. *United States, supra; Commissioner* v. *Dumari Textile Co.,* 142 F. 2d 897 (C.A. 2, 1944).

*Decision will be entered under Rule 50.*