Cardinal Finance Company, Inc., et al., 1 v. Commissioner. Cardinal Finance Co. v. CommissionerDocket Nos. 85718, 85719, 85720.United States Tax CourtT.C. Memo 1963-24; 1963 Tax Ct. Memo LEXIS 321; 22 T.C.M. (CCH) 90; T.C.M. (RIA) 63024; January 28, 1963James W. Hendricks, Esq., 426 W. Jefferson St., Louisville, Ky., for the petitioners. John H. Menzel, Esq., for the respondent. TRAINMemorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in income tax liabilities of petitioners for the fiscal year ended September 30, 1958, in the following amounts: Cardinal Finance Company, Inc.Docket No. 85718$3,356.90James W. Hendricks, Trans-feree, Cardinal Finance Com-pany, Inc. Docket No. 857193,356.90J. R. Harris, Transferee, CardinalFinance Company, Inc. DocketNo. 857203,356.90The issues to be decided*322 are as follows: (1) Whether the balance of the reserve for bad debts should be included in the income of Cardinal Finance Company, Inc., after the sale of all its loan accounts pursuant to a plan of complete liquidation; and (2) Whether Cardinal Finance Company, Inc., should include in income interest that had accrued on loans at the time they were sold. Petitioners James W. Hendricks and J. R. Harris have conceded their liability as transferees of the assets of Cardinal Finance Company, Inc., should any deficiency be determined against the corporation. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. Petitioner, Cardinal Finance Company, Inc., (hereinafter referred to as Cardinal) was incorporated under the laws of Kentucky as a small loan company in October 1954. It filed its income tax returns for the fiscal years ended September 30, 1957, and September 30, 1958, with the district director of internal revenue, Louisville, Kentucky. Petitioners James R. Harris (hereinafter referred to as Harris filed a joint Federal income tax return for the year 1958 with the district director of internal revenue, Louisville, Kentucky. Petitioners*323 James W. Hendricks (hereinafter referred to as Hendricks) and Frances Hendricks, filed a joint Federal income tax return for the year 1958 with the district director of internal revenue, Louisville, Kentucky. Cardinal kept its books and filed its Federal income tax returns on an accrual basis of accounting. It used the reserve method for the treatment of bad debts. Cardinal had 39,300 shares of stock outstanding. As of December 11, 1957, Hendricks owned 33,970 shares and Harris owned 3,700 shares of the Cardinal stock. On December 9, 1957, at a special meeting of the Cardinal shareholders, a plan of complete liquidation was adopted. On December 11, 1957, Cardinal executed an agreement with Welfare Finance Company (hereinafter referred to as Welfare) whereby Cardinal agreed to sell its assets to Welfare. This agreement provided in part as follows: Whereas, Second Party has a license to and is engaged in the Small Loan and Finance business in the City of Louisville, County of Jefferson, State of Kentucky, and is desirous of selling, assigning, transferring, delivering and disposing of all its current accounts, choses in action, promissory notes, chattel mortgages, charged off*324 and paid off accounts, and Whereas, Second Party hereby warrants that it is the sole owner of such accounts, and hereby warrants and agrees that such assets are listed on its books as of December 11, 1957 as follows Now, therefore, having in view the premises and in consideration of the sum of One Hundred Ninety Thousand, Four Hundred Ninety-Sixdollars and.05/100 (190,496.05) and other good and valuable considerations, the receipt of which is hereby acknowledged, except as hereinafter noted, and of the mutual premises, covenants, and considerations herein set forth, Second Party agrees to sell, assign, transfer, set over to and deliver to the First Party, and First Party agrees to purchase of and from said Second Party all the accounts of Cardinal Finance Co. Inc., as of the - day of December, 1957, including current accounts, choses in action, promissory notes, chattel mortgages, charged off and paid out accounts, upon the terms and conditions hereinafter set forth: * * * In accordance with the foregoing agreement, all of Cardinal's loan accounts were sold and transferred to Welfare. In arriving at a purchase price for Cardinal's business, Gene Stanley (hereinafter referred*325 to as Stanley) of Welfare examined each of Cardinal's loans. Each loan was given a grade of 1 through 6 based on Stanley's judgment of its quality. The highest rating was number 1. Welfare made three separate proposals before an agreement was finally reached. The proposal that was accepted provided that Welfare would pay Cardinal a premium of forty percent over the face value of the number 1 and 2 accounts and face value for the number 3, 4 and 5 accounts. In none of the three proposals was any value assigned to the number 6 accounts. At the time the loan accounts were disposed of, the balance in the reserve for doubtful accounts was $9,889.67. Cardinal paid the liabilities stated on its books and distributed the remaining assets to its stockholders for the surrender and cancellation of their stock. The following schedule shows the dates and amounts of each distribution to the shareholders: OtherDateHendricksHarrisShareholdersTotal12-18-57$50,955.00$5,550.00$2,445.00$58,950.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,382.002,220.00978.0023,580.009-26-586,501.98708.19311.797,521.96$77,838.98$8,478.19$3,734.79$90,051.96Cardinal*326 was completely liquidated on September 30, 1958. Cardinal elected to liquidate under section 337, Internal Revenue Code of 1954. In its original return for the fiscal year 1957, Cardinal reduced the basis of its loans by the amount of the reserve for bad debts and computed the gain on the sale as follows: 2Sales price$190,496.053Adjusted basis 140,606.38Gain$ 49,889.67In the notice of deficiency, respondent determined that the amount of the reserve for bad debts should be included in income. Subsequently, on September 28, 1961, Cardinal filed an amended return. On the amended return $9,855.42, the face value of the number 6 accounts, was charged against the reserve for bad debts. The balance of the reserve of $34.25 was used to reduce the basis of the accounts sold. Respondent also determined that Cardinal had additional income of $1,300. This represented the amount of interest accrued on the loans at the time*327 of their sale. Opinion Issue 1 The issue for decision is whether Cardinal must include in income the balance of the reserve for bad debts 4 after the sale of all its loan accounts. Cardinal contends that at the time of their sale the number 6 accounts were worthless and uncollectible. Cardinal argues that this is evidenced by the fact that it received no consideration for these accounts. It is Cardinal's contention that it was entitled to write these accounts off against the reserve for bad debts. Respondent contends that any balance remaining in the reserve for bad debts is properly to be restored to income in the year in which the need for maintaining the reserve ceases. West Seattle National Bank of Seattle, 33 T.C. 341 (1959), affd. 288 F. 2d 47 (C.A. 9, 1961). Respondent maintains that the sale or disposition of Cardinal's loan accounts obviated the necessity for maintaining the reserve for bad debts inasmuch as Cardinal no longer held receivables, the full collection of which might be doubtful. Respondent also contends that since Cardinal received consideration in excess of the face value of its loans, it suffered no*328 loss upon their disposition. Respondent argues that "The fact that no value was ascribed to certain loan accounts in arriving at a purchase price of all the loan accounts cannot be equated with saying that no consideration was received for these accounts where, as here, all loan accounts were sold and the consideration received for them was in excess of the face value of all of the accounts." Respondent argues that these accounts were sold and that it is wholly unrealistic to state that no consideration was received for certain of these accounts. It is respondent's contention that since Cardinal suffered no loss upon the disposition of the loans, no amount on account thereof may be charged against the reserve and it may not be reduced before restoring it to taxable income. We think it is clear that the balance in the reserve for bad debts of $9,889.67 should be included in Cardinal's income. When Cardinal disposed of all its loans, there was no longer any need for the reserve. This Court and others have long held that any balance in a reserve for bad debts is to be restored to income of the year in which the need for maintaining it ceases. Peabody Coal Co., 18 B.T.A. 1081 (1930),*329 aff'd. 55 F. 2d 7 (C.A. 7, 1932); Geyer, Cornell & Newell, Inc., 6 T.C. 96 (1946); O. P. Lutz, 29 T.C. 469 (1957); Great Northern Ry. Co. v. Lynch, 292 F. 903 (C.A. 3, 1921); Wichita Coca-Cola Bottling Co. v. United States, 152 F. 2d 6 (C.A. 5, 1945), certiorari denied 327 U.S. 806 (1946); West Seattle National Bank of Seattle, supra; Ira Handelman, 36 T.C. 560 (1961). Ira Handelman, supra, is very similar to the case before us. In that case, a corporation, pursuant to a plan of complete liquidation, sold all its receivables for $1,254,773.92. The receivables had a face value of $1,400,345.07 and an adjusted basis of $1,179,753.65. The contract of sale provided that "The purchase price for said accounts shall be the total balance owing thereon, less five (5%) percent, as an allowance for uncollectible accounts * * *." 36 T.C. 560, 562.) At the time of the sale, the corporation carried on its books a reserve for bad debts in the amount of $70,517.25. In holding that the balance of the reserve for bad debts was includible in income, we stated at pages*330 566 and 567: The notes and contracts of the face value of $1,400,345.07 which were sold in the year in question did not become worthless so as to justify charging them against the reserve. The petitioner suffered no loss upon such accounts, but rather made a gain. The stipulated adjusted basis of those assets was $1,179,753.65 and they were sold for $1,254,773.92. Clearly then the excess of face value over the amount realized did not constitute a loss realized by the corporation. * * * It is also our conclusion that since, as stated above, the corporation sustained no loss upon the disposition of the notes and contracts and therefore no amount on account thereof may properly be charged against the reserve, there is no reason for reducing such reserve before restoring it to taxable income in the taxable year. In this respect the instant case is similar to West Seattle National Bank of Seattle, supra. The petitioners on brief make much of the fact that in that case there was no evidence to show that the receivables were sold for less than full face value, whereas here there is. But such factual difference is of no consequence. The determining fact in that case and this*331 is that no loss was sustained on the sale. The petitioners on brief also make much of the fact that the corporation, in calculating the gain on the sale of the notes and contracts which was reported in the return as nontaxable gain under section 337 of the Internal Revenue Code of 1954, n3 [footnote omitted] reduced adjusted basis by the amount of the balance in the reserve. However, as we pointed out in the West Seattle National Bank case, the income arising as a result of the cessation of the necessity of maintaining a reserve does not arise from the sale of assets (a reserve for bad debts is neither an asset nor a liability and cannot be transferred), and section 337 of the Internal Revenue Code of 1954 has no application. Following the authorities cited hereinabove we hold that the corporation was in receipt of ordinary income in the year in question upon the cessation of the necessity for the maintenance of its reserve for bad debts. * * * Even if we were to assume that the number 6 accounts were worthless and that Cardinal suffered a loss on the sale, the result of this case would not be changed. Where a debt is sold prior*332 to being charged off, the taxpayer sustains a loss (which in this case would not be recognized because of section 337, 1954 Code) rather than a bad debt chargeable against the reserve. Maurice Levy, 46 B.T.A. 423 (1942), affd. 131 F. 2d 544 (C.A. 2, 1942), certiorari denied 318 U.S. 780 (1943); Benedum v. Granger, 180 F. 2d 564 (C.A. 3, 1950); Reed v. Commissioner, 129 F. 2d 908 (C.A. 4, 1942), affirming 45 B.T.A. 1130 (1941); Von Hoffman Corp. v. Commissioner, 253 F. 2d 828 (C.A. 8, 1958), affirming a Memorandum Opinion of this Court. Cf. Mac Levine, 31 T.C. 1121 (1959) accepting the views of Mitchell v. Commissioner, 187 F. 2d 706 (C.A. 2, 1951), reversing 13 T.C. 368 (1949). In Maurice Levy, supra, the taxpayer sold a debt for less than its face value. Later in the taxable year, the taxpayer charged off part of the debt as a partially worthless debt. In holding that the taxpayer had sustained a loss rather than a bad debt, we stated at pages 425 and 426: The only question before us is whether or not petitioner is entitled to a deduction*333 for a partial bad debt with respect to the account receivable sold by petitioner in the taxable year or whether he is limited in his deduction by section 117 of the Revenue Act of 1936. Petitioner contends that he ascertained the account to be partially uncollectible and charged off that amount in the taxable year. Respondent argues that the sale of the account receivable gave rise to the loss and that the transaction was a sale or exchange of a capital asset within the purview of section 117. * * *We do not disagree with petitioner's claim that he ascertained the account to be partially worthless. Petitioner was in full possession of all facts concerning the debtor's condition and the fact that he sold the account for a price far less than its face amount is strong indication of ascertainment of partial worthlessness. But this fact does not change what occurred. The debt was sold and at the time the charge-off was made on the books of the petitioner he was not in fact the owner of the account receivable. McClain v. Commissioner, 110 Fed. (2d) 878; affd. 311 U.S. 527; Leslie H. Reed, 45 B.T.A. 1130. We may pass the query as to what*334 would have happened had the partial write-off taken place in a prior year when petitioner was still the owner of the debt. Nor are the cases in point which deal with a settlement made directly between a creditor and debtor where the debt is liquidated for less than the amount due. Cf. James R. Stewart, 39 B.T.A. 87. In such circumstances the creditor would ordinarily have a right to charge off the difference. What actually is done rather than what might have been done usually determines the tax consequences. Here there was, within the taxable year, before the actual charge-off of the indebtedness, the sale of the account. The facts bring the case squarely within the provisions of section 117 and, in our opinion, that fact must control, with the consequent limitation of the loss from the sale. We hold that respondent's determination should be sustained. Issue 2 Cardinal contends that the interest accrued on its loan accounts at the time they were sold is not includible in income because it did not collect it. Cardinal contends that Welfare collected the interest and included it in its income. There is no merit in petitioners' contention. Petitioners' argument*335 is apparently based on a misconception of the accrual method of accounting. Under the accrual method of accounting, an item of income accrues and is includible in income when the taxpayer has a fixed or unconditional right to receive it. It is the right to receive and not the actual receipt of an amount that determines its accruability. Spring City Foundry Co. v. Commissioner, 292 U.S. 182 (1934); Estate of Putnam v. Commissioner, 324 U.S. 393 (1945); The Marguardt Corporation, 39 T.C. 443. It is clear from the evidence that Cardinal had a fixed right to the interest at the time the loans were sold. In testifying as to how the accrual was computed, petitioners' own witness testified that: A. The accounts were listed one by one, and the interest was accrued from the date of last payment to the closing date on those accounts which were good accounts. In other words, an account that hadn't paid in 60 days, there was no accrual on, because of the uncertainty of collection. Q. In general how often are payments made to a company in the small loan business? A. They are supposed to be made every month, every 30 days. Q. And when a payment is*336 made on a loan, how is that handled by the office? A. Each payment is analyzed and between principal and interest, and the principal credited to the loan. Q. And the interest? A. And the interest to income. The respondent's determination is sustained. Decisions will be entered for the respondent. Footnotes1. Proceedings of the following petitioners are consolidated herewith: James W. Hendricks, Transferee, Cardinal Finance Company, Inc., Docket No. 85719; and J. R. Harris, Transferee, Cardinal Finance Company, Inc., Docket No. 85720.↩2. No gain was recognized on the sale because of section 337, 1954↩ Code. 3. Computed by petitioner as follows: ↩Face value of loans$150,496.05Less Reserve for bad debts9,889.67$140,606.384. $9,889.67.↩